Matter of Richard HH. v Saratoga County Dept. of Social Servs. (2018 NY Slip Op 04990)





Matter of Richard HH. v Saratoga County Dept. of Social Servs.


2018 NY Slip Op 04990


Decided on July 5, 2018


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: July 5, 2018

524340

[*1]In the Matter of RICHARD HH., Appellant,
v
SARATOGA COUNTY DEPARTMENT OF SOCIAL SERVICES et al., Respondents, and TRACY GG., Appellant.

Calendar Date: May 31, 2018

Before: Garry, P.J., Egan Jr., Mulvey, Aarons and Rumsey, JJ.


Pamela M. Babson, Saratoga Springs, for appellant.
Susan J. Civic, Saratoga Springs, for Tracy GG., appellant.
Michael J. Hartnett, County Attorney, Ballston Spa, for Saratoga County Department of Social Services, respondent.
Mireille R. Nitti, Saratoga Springs, attorney for the child.



MEMORANDUM AND ORDER
Rumsey, J.
Appeal from an order of the Family Court of Saratoga County (Jensen, J.), entered November 30, 2016, which dismissed petitioner's application, in a proceeding pursuant to Family Ct Act article 6, for custody of the subject child.
Respondent Tracy GG. (hereinafter the mother) is the mother of the subject child (born in 2009) and her older sister (born in 1998). In September 2014, both children were removed from the mother's care and placed in the custody of respondent Saratoga County Department of Social Services (hereinafter DSS) after neglect petitions were filed against the mother and respondent Gary FF., the children's father. In February 2015, Family Court issued an order finding the children to be neglected and continuing their placement in the custody of DSS. In October 2015, petitioner, the children's maternal uncle (hereinafter the uncle), filed two petitions [*2]seeking custody of the children pursuant to Family Ct Act article 6 and for permission to intervene in the neglect proceedings pursuant to Family Ct Act
§ 1035 (f)[FN1]. Family Court's denial of the uncle's motion to intervene was reversed by this Court (Matter of Demetria FF. [Tracy GG.], 140 AD3d 1388 [2016]). Upon remittal, the uncle was joined and two permanency hearings were conducted with respect to the younger child. Following a trial on the uncle's custody petition and a Lincoln hearing, Family Court dismissed the uncle's petition. The uncle and the mother both appeal.[FN2]
Preliminarily, the uncle argues that he has been prejudiced by DSS's failure to comply with Family Ct Act § 1017, which provides, as relevant here, that when a court determines that a child must be removed from his or her home based on neglect, the court shall direct the local commissioner of social services to conduct an immediate investigation to locate relatives who may be a placement resource and to provide any such individuals with written notice of the pendency of the neglect proceeding and the opportunity to seek custody of the child (see Family Ct Act § 1017 [1] [a]). After the investigation is completed, the court must determine whether there is a relative with whom the child may appropriately reside (see Family Ct Act § 1017 [1] [c]). If a suitable relative exists, the court is required to "either place the child with that relative or with the local commissioner of social services with directions to allow the child to reside with that relative pending his or her approval as a foster parent," and, notably, only if no suitable relative can be located should Family Court consider another placement (Matter of Randi NN. [Joseph MM.—Kimberly MM.], 68 AD3d 1458, 1459 [2009], citing Family Ct Act § 1017 [former (2) (a)]). "The statute, in short, is intended to guard not only the rights of relatives of a child who is removed from his or her home, but also to protect the rights and interests of children to be placed with their relatives" (id. at 1459-1460 [internal quotation marks and citations omitted]). It accomplishes this purpose by requiring that the initial placement of children who must be removed from their homes be made, whenever possible, with a relative, thereby allowing them to form or maintain bonds with family members rather than with foster parents. Indeed, "a placement order must be set aside if a failure to comply with [Family Ct Act § 1017] prejudiced either the rights of a relative to seek placement or the child's right to be placed with a suitable relative" (id. at 1460 [internal citation omitted]).
The uncle testified that he received a single telephone call from DSS personnel approximately four months after the children were placed in DSS custody asking whether he would be a custodial resource if the mother's parental rights were terminated, and that he responded affirmatively. He stated that DSS did not advise him how to become a foster parent or that he could seek custody, and DSS did not contact him again until after he filed the instant [*3]custody petition — more than one year after the children were first removed from the mother's home — when it sent him the New York State Handbook for Relatives Raising Children. In its appellate brief, DSS admitted that it did not timely provide the uncle with the required information, but criticized him for not sooner seeking custody. Notably, the statute did not impose a duty on the uncle to have affirmatively sought placement based solely upon DSS's inquiry regarding his willingness to be a custodial resource if the mother's parental rights were terminated and before he was advised of the procedures by which he could do so. Rather, the statute imposed a duty on DSS to "immediately" conduct an investigation to locate relatives and provide the required information, in writing (Family Ct Act § 1017 [1] [a]; see Matter of Randi NN. [Joseph MM.—Kimberly MM.], 68 AD3d at 1460).
The uncle asserts that both he and the child have been prejudiced by her long-term placement with foster parents in violation of the clear statutory preference for initial placement with a relative. This issue is not directly presented to us because there has been no appeal from the neglect proceeding. However, we address it because the failure of Family Court and DSS to strictly follow the statutory mandate to seek initial placement with a relative in this case created the very harm the statute was intended to prevent — long-term placement in foster care rather than with a suitable relative. Indeed, not only did DSS fail to identify the uncle as a custodial resource and to provide him with the mandated information, it ignored his initial expression of willingness to serve as a custodial resource for the child. Moreover, when the uncle filed his custody petition, he was treated as an unwelcome interloper by both DSS and Family Court, which erroneously denied his motion to intervene in the Family Ct Act article 10 proceeding and contemplated staying an investigation regarding the uncle's suitability as a custodial resource that was being conducted in Texas pursuant to the Interstate Compact on the Placement of Children (see Social Services Law § 374-a [hereinafter ICPC]). Family Court's conclusion that "[h]ad the [u]ncle requested that [the child] be placed with him in September, 2014, when she was initially placed in foster care, DSS may very well have placed [the child] with the [u]ncle" ignores the fact that DSS failed to fulfill its statutory duty to inform the uncle of the methods by which he could seek placement of the child. These failures are especially egregious given that Family Court and DSS now agree that the uncle and his wife are able to provide a good home for the child. Such conduct cannot be condoned and we emphasize that the procedures mandated by Family Ct Act § 1017 are to be strictly followed.
Notwithstanding the foregoing, we turn to the resolution of the uncle's custody petition. We note that neither the father nor the mother opposes the uncle's requested relief and, therefore, we need not determine whether extraordinary circumstances exist that warrant the grant of custody to a nonparent (see generally Matter of Arlene Y. v Warren County Dept. of Social Servs., 76 AD3d 720, 720-721 [2010], lv denied 15 NY3d 713 [2010]). Rather, we proceed directly to consideration of whether granting custody to the uncle is in the child's best interests (see e.g. Matter of Renee DD. v Saratoga County Dept. of Social Servs., 154 AD3d 1131, 1132 [2017]), with no preference being afforded to the uncle based on his status as a relative (see Matter of Autumn B., 299 AD2d 758, 759 [2002]). "Factors to be considered in a best interests analysis include maintaining stability in the child's life, the quality of the respective home environments, the length of time the present custody arrangement has been in place and each party's past performance, relative fitness and ability to provide for and guide the child's intellectual and emotional development" (Matter of Nevaeh MM. [Sheri MM.—Charles MM.], 158 AD3d 1001, 1003-1004 [2018] [internal quotation marks and citations omitted]). Although we accord deference to Family Court's factual findings, we will not uphold a best interests determination that lacks a sound and substantial basis in the record (see Matter of Prefario v [*4]Gladhill, 90 AD3d 1351, 1354 [2011]; Matter of Gravelding v Loper, 42 AD3d 740, 742 [2007]).
When these factors are considered, Family Court's determination that it is in the best interests of the child to maintain her placement in foster care rather than to grant custody to the uncle lacks a sound and substantial basis in the record. The evidence establishes that the uncle is an experienced parent who can provide an appropriate home environment and has the skills and desire to provide for and guide the child's intellectual and emotional development. He is 61 years old and lives in Texas with his wife, who is 55 years old and supports the uncle's efforts to gain custody of the child. The uncle and his wife both testified, and Family Court specifically found them to be credible witnesses. The uncle works as a nurse anesthetist and his wife as a nurse practitioner, and both are in good health. They reside in a five-bedroom home located on a cul-de-sac in a neighborhood with many school-aged children and have an ample income that would allow them to provide the child with additional educational and travel opportunities. The uncle and his wife each have adult children, who are complimentary of their parenting skills and their manner of interacting with their respective grandchildren, including children who are approximately the same age as the child.
Although the uncle only met the child once prior to her being placed in foster care, he has had regular contact with her since he filed the custody petition, including one 90-minute visit with her at the offices of Child Protective Services and, beginning in December 2015, various telephone calls and twice-weekly Skype video calls, each lasting 30 to 45 minutes, which he said the child appeared to enjoy. He found her to be "bright, vivacious, funny . . . precocious and very engaging," and testified that, in his view, he and the child had formed an instant bond. He is aware that the child was removed from the mother's home because she had been sexually abused and, to prepare for her arrival, he and his wife have taken classes for parenting a child who has experienced sexual abuse. He has selected a pediatrician, dentist and therapist for the child and is prepared to enroll her in a well-regarded parochial school. They also painted a bedroom in their home in her favorite colors.
The uncle and his wife are strongly motivated to help the child build and maintain relationships with her family. The uncle has six grandchildren who live nearby whom they plan to introduce to the child. The uncle also testified that the child's older sister is welcome to visit at any time and that he would permit the child to maintain contact with her foster family. He also testified that he would permit the mother to have contact with the child by Skype and, although he would never permit them to be alone together, he envisioned a time when it would be appropriate to permit them to have personal visits under controlled conditions. Texas Department of Family and Protective Services conducted an investigation pursuant to the ICPC, which resulted in a determination that the uncle and his wife are well-qualified to serve as foster and adoptive parents. Based on the evidence adduced at the hearing, Family Court concluded that "[b]oth the [u]ncle and [his wife] are lovely people and can provide a nice home for [the child]."
By contrast, the foster parents did not testify and there was no direct evidence regarding their home environment or their relationship with the child. Thus, the present record does not permit a comparison of their home environment with that offered by the uncle, or an evaluation of the foster parents' past performance or relative fitness and ability to provide for and guide the child's intellectual and emotional development. The only witness who testified in opposition to the petition was the child's counselor, Kelly Daugherty, a licensed clinical social worker who had weekly one-hour counseling sessions with the child beginning in September 2015. Daugherty [*5]testified that the child was receiving treatment for the trauma caused by the sexual abuse that she had experienced and that, although she had made progress, continued treatment was indicated. She also opined that a change in therapist will generally prolong therapy. Based solely on her observations of interaction between the child and the foster mother during counseling sessions, Daugherty stated that there appeared to be a close relationship between the child and the foster mother. She also noted that the child had experienced multiple transitions, having been placed in two different foster homes since being removed from the mother's home and having received treatment from three therapists. Daugherty opined that although the child had been "resilient" in her transitions, it would be in her best interests to remain in the care and custody of the foster parents because relocation to the uncle's home would require her to experience yet another transition.
Family Court relied heavily on Daugherty's testimony in concluding that it was in the best interests of the child to remain in the care and custody of the foster parents to avoid the necessity of experiencing another transition. Daugherty's testimony, however, addresses only one factor of the best interests test — maintenance of stability in the child's life — and, as we have noted, the record is devoid of evidence regarding the foster parents, their home and their relationship with the child that is required to adequately consider the remaining factors. The court also improperly relied on Daugherty's opinion that it was in the child's best interests to remain in the care and custody of the foster parents. Daugherty, who conceded that custody evaluations were not within her area of expertise, was qualified as an expert only with respect to the child's counseling needs, and not for the dispositive best interests determination. In any event, Daugherty's testimony does not establish that she had a sufficient factual foundation on which to base such an opinion. Further, our review of the record does not support the attorney for the child's assertion that the child was opposed to living with the uncle and his wife.
Finally, Family Court's determination that the evidence was insufficient to establish that the uncle could provide the child with a stable environment is not supported by the record. The uncle and his wife have been married since 2012 and have resided together in their present home continuously since 2013. Further, the ICPC investigation concluded that they have a stable marriage. Thus, we conclude that Family Court's determination to dismiss the uncle's custody petition and continue placement of the child with the foster parents lacks a sound and substantial basis in the record. Rather, the uncontroverted evidence establishes that the uncle can provide a safe and appropriate home for the child and, accordingly, his petition is granted.
Garry, P.J., Egan Jr., Mulvey and Aarons, JJ., concur.
ORDERED that the order is reversed, on the law, without costs, and petition granted.



Footnotes

Footnote 1:The uncle withdrew his petition seeking custody of the subject child's older sister because she had reached the age of majority during the pendency of the proceedings.

Footnote 2:The mother did not file and serve her notice of appeal within 35 days after the order was mailed to her by the Clerk of the Family Court; accordingly, her appeal is untimely and we lack jurisdiction to consider it (see Family Ct Act § 1113; Matter of Boryana D. [Victoria D.], 157 AD3d 1011, 1011 n [2018]; Matter of Ucci v Ucci, 93 AD3d 1110, 1111 [2012], lv dismissed 19 NY3d 941 [2012]).